[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 21, 2004
THOMAS K. KAHN
CLERK

_____

No. 98-6882

_____

D. C. Docket No. 94-02175-CV-B-E

JOHN W. PEOPLES, JR.,

Petitioner-Appellant,

versus

DONAL CAMPBELL, Commissioner
of the Alabama Department of Corrections,
ATTORNEY GENERAL OF THE STATE
OF ALABAMA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 21, 2004)**

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

TJOFLAT, Circuit Judge:

On December 7, 1983, in the Circuit Court for Talladega County, Alabama, a jury found the Petitioner, John W. Peoples, Jr., guilty on five counts of capital murder.[1] The trial judge accepted the jury's sentencing recommendations[2] and on January 27, 1984, sentenced Peoples to death on each count. After exhausting his direct-appeal and post-conviction remedies in state court, Peoples applied to the United States District Court for the Northern District of Alabama for a writ of habeas corpus. The district court denied relief, and Peoples now appeals. We affirm.

---

[1] The five counts alleged essentially read as follows: Count I, Peoples murdered Paul G. Franklin, Jr. and Judy Franklin by striking them on the head with a rifle or other object, in violation of Ala. Code § 13A-5-40(a)(10) (1975), as amended; Count II, Peoples murdered Paul G. Franklin, Sr. by striking him on the head with a rifle or other object while abducting, or attempting to abduct, him with the intent to inflict physical injury, in violation of Ala. Code § 13A-5-40 (a)(1) (1975), as amended; Count III, Peoples murdered Paul G. Franklin, Jr. by striking him on the head with a rifle or other object while abducting, or attempting to abduct, him, in violation of Ala. Code § 13-A-5-40(a)(1) (1975), as amended; Count IV, Peoples murdered Paul G. Franklin, Sr. by striking him on the head with a rifle or other object while he knowingly and unlawfully entered or remained unlawfully in Paul G. Franklin, Sr.'s dwelling located at Rt. 2, Pell City, Alabama, with the intent to commit the crime of theft therein, and while effecting entry or while in the dwelling or in the immediate flight therefrom Peoples or Timothy Millard Gooden, a participant in said crime, was armed with a rifle, a deadly weapon, in violation of Ala. Code § 13-A-5-40(a)(4) (1975), as amended; Count V, Peoples murdered Paul G. Franklin, Sr. by striking him on the head with a rifle or other object while committing the theft of a 1968 Corvette automobile or a Winchester .22 caliber rifle by threatening the imminent use of force against Paul G. Franklin, Sr., with the intent to compel his acquiescence in the taking or escaping with the property, while Peoples was armed with a deadly weapon, a rifle, in violation of Ala. Code § 13A-5-40 (a)(2) (1975), as amended.

[2] As indicated in Part II.B., infra, the jury, at the conclusion of the sentencing phase of the trial, recommended that Peoples be sentenced to death for each murder by an 11-to-1 vote.

This opinion is organized as follows. In Part I, we recite the facts established by the evidence presented to the jury during Peoples's trial. Part II recounts the procedural history of the case in the Alabama courts—at the prosecution stage, on direct appeal, and on collateral attack— and in the district court on habeas corpus. Part III states the issues we address and the legal standards we apply in resolving them. In Part IV, we analyze these issues and decide them. Part V briefly concludes.

## I.

In the evening of Wednesday, July 6, 1983, after the sun had gone down, Peoples, accompanied by his younger cousin, Timothy Gooden, drove his Toyota pick-up truck to the lakeside residence of Paul and Judy Franklin in St. Clair County, Alabama. Peoples went there intending to purchase Paul Franklin's red 1968 Chevrolet Corvette.[3] When the two men arrived, Peoples got out of the pick-up truck and entered the residence. Meanwhile, Gooden drove off to a nearby store to buy a pack of cigarettes. Gooden returned around 9:30 p.m., and he joined Peoples and the Franklins who were sitting around a table.

---

[3] Peoples knew about the Corvette because he had been a member of a work crew that built a fence around the Franklins's backyard and from time to time had performed odd jobs in and around the Franklin residence.

Peoples soon left the table to look for the Franklins' ten-year old son, Paul, Jr. He found Paul, Jr. wearing his pajamas and watching television in another part of the house, and he brought him to the table where Gooden and the boy's parents were sitting. At this point, Peoples asked Paul Franklin to sell him his Chevrolet Corvette. Franklin refused, explaining he wanted to keep the car for his son. Peoples persisted, but to no avail. So, he became angry and left the room.

Peoples returned moments later with Paul Franklin's .22 caliber Winchester rifle and some blankets and ropes. With Gooden's help, he gagged and blindfolded Judy Franklin and Paul, Jr., then took Paul Franklin[4] downstairs to the basement, leaving Gooden to keep an eye on Judy and the boy. In a minute or two, Gooden heard a commotion from the basement and started down the stairs with Judy and Paul, Jr. At this point, Judy Franklin nudged Gooden in the side; he removed her gag, and she told him she needed to go to the bathroom. Gooden consented. Once inside the bathroom, Judy Franklin found an eyebrow pencil, scribbled the name "John Peoples" on the lid of the laundry hamper, and covered the lid with clothing. When she left the bathroom, Gooden replaced her gag and

---

[4] Paul Franklin was seriously disabled as a result of shrapnel injuries suffered in Vietnam. His injuries substantially limited his mobility.

4

blindfold and took her and Paul, Jr. to the basement where they found Paul Franklin lying on the floor by the pool table. He appeared to be dead.

Following Peoples's instructions, Gooden moved the Toyota pick-up truck to the basement door. That done, Peoples and Gooden secured Judy Franklin and Paul, Jr. in the pick-up truck. Peoples then covered Paul Franklin's body with a blanket and placed it in the Corvette along with Franklin's Winchester rifle. With Gooden following in the pick-up truck, Peoples drove the Corvette to a wooded area in neighboring Talladega County. After parking, he dragged Paul Franklin's body into the woods. On returning, he armed himself with the Winchester rifle and took Judy and Paul, Jr. out of the truck. With Judy Franklin screaming and begging for their lives, he pulled them into the woods. There, he murdered them by crushing their skulls with the rifle. Gooden remained with the Corvette and pick-up truck while all of this was taking place.

When Peoples had finished, he and Gooden returned to the Franklin residence and rummaged around the house in search of money. They stayed for ten to fifteen minutes then left. Peoples, driving the Corvette, went to his apartment in the City of Talladega, at the Talladega Downs complex, arriving after midnight. Gooden drove Peoples's pick-up truck to his home, also located in Talladega.

5

Barbara Eastwood, one of Peoples's neighbors, was walking toward the Talladega Downs when Peoples arrived at the apartment complex. After Peoples got out of the Corvette, they had a brief conversation about the car, which she had not seen before. He told her that it was an early birthday present for his wife. As they were talking, she noticed what he was wearing—a light colored shirt and blue jeans.

A half hour later, around 2:00 a.m., Peoples left his apartment with his wife and drove to Gooden's home to retrieve his pick-up truck. There, he showed Gooden some cash—in excess of $1,100—and told him he would "fix him up" later. After a brief conversation, Peoples and his wife departed.

Later that morning, Thursday, July 7, the Franklins' housekeeper of three years, Rosa Lee Truss, arrived at the Franklin residence. She found the front door unlocked and no one at home. Most of the lights in the house and two television sets were on, and the Corvette, which was usually parked in the garage, was missing. As she began her housekeeping chores, "a little voice" told her that something was wrong and to get out of the house.[5] So, she left the residence in a hurry.

---

[5] Testifying as a prosecution witness at Peoples's trial, Truss said that shortly after she turned on the vacuum, she heard a voice telling her, "Rosa, get the hell out of here and now."

Mr. Franklin's mother, Rose Franklin, came to the Franklin residence at approximately 2:00 p.m. that day and was surprised to find no one home. After waiting at the house for some time, she became increasingly concerned. She called her other son, Hugh Franklin, in Blakely, Georgia, and Dean Choron, Judy Franklin's mother, to find out if either knew the whereabouts of the family. Neither had heard from Paul or Judy, so she called the St. Clair County Sheriff's Office to report that the family was missing.

That night, at around 8:00 p.m., two deputies in that office, Gary Cone and Jimmy Martin, responding to the phone call, came to the Franklin residence. They looked around the house but saw nothing suspicious. Nonetheless, they radioed a message to the sheriff's office that the Franklin family and their Corvette were missing. Later, when the deputies returned to the sheriff's office, Cone filed an incident report and inputted the Corvette's license tag number into the National Crime Information Computer (the "NCIC"), which tracks and compiles a list of automobiles reported as stolen or missing.

The following evening, Friday, July 8, Investigators Marvin Roye and Ed Traylor of the Alabama Bureau of Investigation (the "ABI") arrived at the Franklin residence along with Owen Harmon, an investigator in the St. Clair County Sheriff's Office. Rose Franklin and Dean Choron greeted them when they arrived.

7

Among other things, the investigators wanted to know whether they had noticed anything missing other than the Corvette. Both women had looked around the house and felt that everything seemed to be in place; nothing appeared to be missing. The inspectors spent approximately three hours going about the house. When they came to the basement, to the place where the Corvette was usually parked, they noticed a boot print in an oil slick on the floor. The print matched the sole of one of the boots Peoples was wearing the night of July 6, when he and Gooden came to the Franklin residence.

Two days later, on Sunday, July 10, with the Franklin family still missing, Roye and Traylor returned to the residence. They discovered John Peoples's name written on the laundry hamper in the upstairs bathroom. Dean Choron recognized the handwriting as her daughter's. When Roye asked her if the name John Peoples was familiar to her, she told him that she had heard the name mentioned but had never met the man. Rose Franklin said that a John Peoples had done some work around the house, had borrowed money from her son in the past, and recently had been trying to borrow more money.

The next day, Monday, July 11, Paul Wesson, the owner and proprietor of Wesson's Pharmacy, which was located in Childersburg, Alabama, called the town's chief of police, Ira Finn. A man was trying to sell Wesson a red 1968

8

Corvette, and he was interested in buying it. Something about the offer seemed strange, though, so Wesson decided to call the chief to find out if anything was amiss about the car. Finn was aware that a red 1968 Corvette had been reported as missing on the NCIC. He told Wesson that another police department was looking for a car like the one he was describing and that some of his officers would be arriving at the drug store in a few minutes.

Shortly after 1:30 p.m., two squad cars carrying Captain Lewis Finn and Officers Harlow and Watson arrived at the drug store. The Corvette was parked in front of the store; Peoples was inside the store with Wesson. Captain Finn told Peoples why they were there and asked him if he would be willing to come down to the Childersburg police station to discuss the matter. Peoples agreed. He drove the Corvette to the station, with Harlow as a passenger; Finn and Watson drove the squad cars. Meanwhile, Chief Finn notified Investigators Traylor and Harmon that a Corvette matching the missing car's description had been located and that the man possessing it was on his way to see him.

Peoples got to the police station at approximately 1:55 p.m. and met with Chief Finn. Peoples told Finn that he had purchased the car from Paul Franklin and produced a handwritten document, which he referred to as a "Bill of Sale," which reads "I Paul Franklin trade John Peoples one 1968 Corvette for 50 percent

9

ownership of the C. J. Supper Club." The document bears the following signatures: "Paul G. Franklin, John W. Peoples, and Judy Franklin." Two sets of figures, also handwritten, appear at the bottom of the document: "1946785406573 and 59A7093 59-5560."[6]

Traylor and Harmon arrived at the police station at 2:15 p.m. and met with Chief Finn for twenty to thirty minutes. After that, they met with Peoples and read him his Miranda rights. They then asked him about the circumstances surrounding his acquisition of the Corvette and the document he had given Chief Finn. At some point during the interview, Traylor asked Peoples if he would give them permission to search the Corvette, his Toyota pick-up truck, and his apartment in Talladega. Peoples agreed and signed a "Permission to Search" form.

After he executed the form, Peoples and the two investigators left the police station and rode to the home of Peoples's parents in Childersburg, where he had left his pick-up truck. The investigators surveyed the truck but found nothing of interest. Next, they headed to Talladega to search Peoples's apartment. There, Traylor found a box of dirty clothes which contained a light-colored shirt and a

---

[6] The State's case-in-chief included handwriting-comparison evidence that the signature Paul G. Franklin was written by Judy Franklin.

10

pair of blue jeans that appeared to be blood-stained.[7] Peoples was wearing these clothes when he encountered Barbara Easterwood outside the Taladega Downs apartment complex the night of the murders. When Traylor inquired about the stains, Peoples, now visibly upset, explained that they were probably caused by barbecue sauce he spilled while barbecuing on the Fourth of July. Traylor took custody of the shirt and blue jeans (and they were introduced into evidence at Peoples's trial).

On July 13, 1983, law enforcement officers recovered the bodies of the missing Franklins in a wooded area near Talladega County Road No. 377. Sometime around midnight on July 14, or very early the next day, July 15, Traylor and Harmon showed Gooden the blood-stained shirt and blue jeans they had recovered from Peoples's apartment.[8] They had learned that Gooden was present when Peoples acquired the Corvette. At this point, Gooden decided to lead them to the location where the bodies had been found on July 13. He took them there shortly after daylight, and he told them how the murders had occurred.

The next week, on Tuesday, July 19, Peoples, who had at some point been taken to the Ashville County Jail, gave Neil Woodall, a police officer in Ashville,

---

[7] Paul, Jr.'s blood had caused the stains. Fibers from Paul, Jr.'s pajamas were also found on the shirt and blue jeans.

[8] By this time, the police had determined that the stains were blood stains.

a handwritten note in which he stated that he wanted to see the Sheriff of St. Clair County, Lewis Brown. Brown promptly came to the jail, arriving around 8:30 p.m. Peoples told Brown that he also wanted to speak to the Sheriff of Talladega County, Jerry Studdard, so Brown summoned him to the jail. When Studdard arrived, Peoples told the two sheriffs that he wanted to tell them something. Brown asked him if he wanted an attorney present. Peoples said yes, Ray Robbins. Brown found Robbins's home telephone number in the telephone book and gave it to Peoples. Peoples dialed the number but received no answer. Brown then asked Peoples if he would like to try another attorney. Peoples suggested George Sims. Brown called information for Sims's telephone number and gave it to Peoples. Peoples then said he did not need an attorney; he would "just speak to y'all." Brown began reading Peoples his <u>Miranda</u> rights, but Peoples interrupted, pointing out that he had "heard those hundreds of times. I probably know more about them than you do." Brown nevertheless continued reading Peoples his rights.

After Peoples acknowledged that he understood his <u>Miranda</u> rights and repeated that he did not want to have an attorney present, he began telling the

sheriffs what was on his mind and promptly confessed to the crime.[9]  He told the sheriffs where they could find the blanket he used to cover Paul Franklin's body. He also informed them of the approximate location of the rifle he had used to murder Judy Franklin and Paul, Jr.  When he finished, Peoples wrote a brief statement on a waiver of rights form he and the two sheriffs had signed.  The statement reads, "The Case I am in I did DO IT Concerning the Franklin Family I did DO IT."  After making this statement, Peoples told the sheriffs that he felt relieved sharing this information with them.

Three days later, on Friday, July 22, 1983, Peoples volunteered to take Terry Brewer and Ricky Daniel, deputies in the Talladega County Sheriff's Office, to the murder weapon which the police had not been able to locate.  Daniel immediately read Peoples his Miranda rights from a waiver of rights form, and Peoples signed the form.  He also initialed the following statement that Daniel had added to the form: "I already have a Lawyer, but I do not wish to talk to him or have him present with me at this time."  After this, Peoples led Daniel and Brewer to the .22 caliber Winchester rifle he had taken from the Franklin residence on July 6.  He

---

[9]  After Brown finished reading Peoples his rights, Peoples told him that he understood them then repeated that he wanted to speak to the two sheriffs and that he did not want to call a lawyer.  He added, however, that he did not want them to write down what he said or to tape record the conversation.  The sheriffs agreed to this request.

13

had wrapped the rifle in an orange towel and hidden it in some underbrush shortly after committing the murders. The rifle was noticeably bent and damaged. Strands of hair stuck to the rifle's barrel were "microscopically consistent" with Judy Franklin's hair. Autopsy findings confirmed that Judy Franklin and Paul, Jr. had died as a result of blunt trauma to the skull; these findings were consistent with the impact a tremendous blow from the rifle would cause.

## II.
### A.

On August 3, 1983, a Talladega County grand jury indicted Peoples for the Franklin murders.[10] After the indictment was lodged in the Talladaga County Circuit Court, William A. Short, Jr., a lawyer practicing out of Bessemer, Alabama, filed his appearance as Peoples's attorney. Short represented Peoples throughout the pretrial, trial and sentencing proceedings in the Talladega County Circuit Court and, after Peoples was convicted and sentenced, prosecuted his appeals to the Alabama Court of Criminal Appeals and the Alabama Supreme Court. Short also represented Peoples in his collateral attacks on his convictions and sentences in the Alabama courts.

---

[10] See supra note 1.

On August 19, Short moved the circuit court to dismiss the indictment on the ground that the State had granted Peoples immunity.[11] Short alleged that, during the period July 13 – 15, an Assistant District Attorney of St. Clair County, Dennis Abbott, had promised Peoples that if he "would give a statement[,] assist law enforcement authorities in locating the bodies of the victims . . . and submit to a polygraph examination[,] he would not be further charged in the matter." Short further alleged that Peoples gave the statement and assisted the police in locating the victims' bodies, and that he was prepared to take a polygraph examination when the District Attorney of Talladega County, Robert Rumsey, acting for the State of Alabama, revoked Abbott's offer of immunity.

The court held an evidentiary hearing on the motion on October 4, 1983. On October 14, it entered a written order denying the motion. In the order, the court found the following facts:[12] On July 13, Peoples, still insisting that he

_____

[11] On August 19, Short also moved the circuit court for a change of venue—to a county where the publicity about the case had been minimal. Short renewed his motion on August 30 and November 11, as the publicity increased. The court denied his motion on each occasion. Venue is not an issue in this appeal; hence, we do not discuss it further.

[12] Many pieces of evidence on which the court based its findings of fact were not presented to the jury during the trial. For example, the jury heard nothing about the events that transpired between Traylor and Harmon's search of Peoples's Talladega Downs apartment (where they found the blood-stained shirt and blue jeans) in the afternoon of July 11 and Peoples's note to Officer Woodall on July 19, stating that Peoples wanted to see Sheriff Brown. The same is true with respect to the evidence introduced at the suppression hearing the circuit court held on December 1 and 2 (during Peoples's trial), and at the hearing held on Peoples's motion for a new trial. See infra Parts II.B and II.C. Much of the testimony the court heard at those two hearings

15

bought the allegedly stolen Corvette from Paul Franklin and that he had no knowledge of the Franklins' disappearance, informed an officer at the St. Clair County jail (where he was being detained in connection with his arrest for the theft of the 1968 Corvette) that he wanted to take a polygraph examination. After Peoples discussed the matter with Ray Robbins, his attorney, Robbins met with Dennis Abbott, and they agreed that if Peoples submitted to a polygraph examination and the examination "establish[ed] that he was not involved in the disappearance and murders of the Franklins," he would be released from custody on the theft charge. On July 15, Peoples, accompanied by Robbins, appeared in Gadsden, Alabama, for the polygraph examination. The examiner told Peoples that he would ask him these questions: "did he take the Franklin family from their house that night; did he hit Judy Franklin in the head last week; were you physically present when Judy Franklin was hit in the head; and do you know for sure who hit Judy Franklin."[13] At that point, Peoples "said that he was having trouble remembering if he committed the crime." Then, after the examiner "told [him] that if he lied during the examination the test would show it, [Peoples]

was not presented to the jury.

[13] The court found that before the examiner informed Peoples that he would be asked these questions, Peoples "told the examiner he wanted two questions asked: did he kill all of the Franklins at the same time; and did he kill all of them at their house. The examiner told him that those would not be the questions."

16

refused to take the polygraph examination." Peoples later "acknowledged . . . that the story [he] had told was false."

The court found that "[t]he reason [Peoples] refused to take the polygraph examination was that he knew or believed the examination would show that the story he had been telling that he was not involved in the murders was false and would show that in fact he was involved in the murders." Assuming that the State had struck the immunity agreement Peoples alleged it had made, the court found that "his refusal to take the examination amounted to a material breach of the agreement's terms." The court concluded its findings with this statement: "none of the . . . representatives of the State of Alabama violated any agreement with [Peoples], revoked or attempted to revoke any agreement with [him], or engage[d] in any trickery, deceit, or sharp practices involving him."

On August 19, the same day he moved the court to dismiss the indictment, Short moved the court to suppress "any and all statements and the fruits thereof including physical evidence [Peoples gave] to any law enforcement officer after he was taken to police headquarters in Childersburg" on July 11, 1983. According to Short, the police arrested Peoples at Wesson's Pharmacy without probable cause;

17

therefore, what Peoples said and gave (the Bill of Sale)[14] to Chief Finn and Inspectors Traylor and Harmon at the police station, the evidence Traylor and Harmon obtained at his apartment with his consent, and the incriminating evidence he disclosed (including the location of the victims' bodies and Paul Franklin's 22. caliber Winchester rifle) after he was taken to the St. Clair County jail and held for the theft of the 1968 Corvette constituted the fruit of a poisonous tree. The court deferred ruling on the motion to suppress until trial.

B.

The trial began on November 30, 1983.[15] The court entertained Peoples's motion to suppress during the second and third days of the proceeding. What prompted the hearing was a question the prosecutor put to Investigator Ed Traylor. The prosecutor asked Traylor whether he had a conversation with Peoples on July 11 at the Childersburg Police Station; Short objected, and the court excused the jury. The prosecutor thereafter presented the testimony of the law enforcement

---

[14] As recounted in Part I, supra, the purported bill of sale stated that Peoples had traded his ownership rights in a supper club in exchange for Paul Franklin's Corvette. Curtis Jackson, the actual owner of the supper club, informed the Chief on July 11 that Peoples did not have the rights in the club that he purported to "trade."

[15] On November 28, Short moved the court to allow Peoples to act as co-counsel during the trial. The court granted the motion. As far as we can tell, however, other than conferring with Short, Peoples remained silent throughout the guilt and penalty phases of the trial.

officers who had interacted with Peoples at Wesson's Pharmacy and at the police station.[16]

Captain Finn told of encountering Peoples at Wesson's Pharmacy and asking him to accompany him and Officers Harlow and Watson to the police station to see Chief Finn. They arrived at the police station shortly before 2:00 p.m. and took Peoples to Chief Finn's office.[17] Chief Finn described what took place next:

> John - he was asking me why the hell we had him, what we were arresting him for and I told him we did not arrest him. What we was after, I said, "John, see right here in the paper, this car is on the NCIC Machine and it's also in the paper and I had it wrote down on this big pad on my desk." I had the tag number and all and I said this car is reported stolen from Pell City, and three members of a family.

Peoples responded to what Finn said by throwing down a handwritten document, and exclaiming, "Well, by God, I didn't steal the damn car. I've got [this] bill of sale for it." (The "Bill of Sale" is described in Part I, supra. It was introduced into

---

[16] The prosecutor also presented the testimony of the Sheriffs of St. Clair and Talladega Counties, Brown and Studdard, who on July 19 received from Peoples the statement quoted in Part I, supra, and Deputies Brewer and Daniels of the Talladega County Sheriff's Office, whom Peoples led to the location of Paul Franklin's .22 caliber Winchester rifle on July 22. The testimony the deputies gave at the suppression hearing described in the text was essentially repeated before the jury after the court denied Peoples's motion to suppress. See supra Part I.

[17] On March 12, 1984, during Peoples' motion for a new trial, Chief Finn explained that he had known Peoples "all his life" because Finn's grandfather-in-law was the brother of Peoples' grandfather, and Finn spoke with Peoples's father on numerous occasions.

evidence after the court denied Peoples's motion to suppress.)  Chief Finn looked at the document and said, "well that ain't too much [of] a bill of sale.  It's not notarized."  In response, Peoples said, "well, I've got a goddamn tag receipt" and slammed down another piece of paper on the Chief's desk.  At this point, Chief Finn said, "Well, John, me and you don't have too much problems. . . .  Now, I do have a warrant on you for a bad check."  Peoples asked, "who in the hell got that?" and Chief Finn answered, "Mr. Dennis out there at the auction barn."  Peoples replied, "Well, I done told that son-of-a-bitch when I was going to pick this check up."  Finn concluded the conversation by telling Peoples, "Well me and you don't have any problems.  We are waiting for the ABI [Alabama Bureau of Investigators] to get down here."

When the hearing ended, on December 2, the court read its findings of fact into the record and denied Peoples's motion to suppress.  The court concluded that the police had probable cause on July 11 to arrest Peoples without a warrant for theft of a motor vehicle.  However, the court neglected to pinpoint when on July 11 they acquired such probable cause or whether Peoples was arrested before or after Traylor and Harmon, having found what appeared to be blood-stained blue jeans and shirt in Peoples's Talladega apartment, decided to take him to the St. Clair County jail.  The court also concluded that Peoples knowingly and

20

voluntarily gave the Bill of Sale to Chief Finn at the police station. The court did not address the question of whether Peoples was in custody at the time—and thus entitled to an advice of rights—apparently because Short's motion to suppress did not allege that Peoples was in custody when he arrived at Chief Finn's office and thereafter.

In announcing its findings of fact and conclusions of law from the bench, the court stated that it would enter a written order on the motion. It did so on January 23, 1984. Although the findings of fact and conclusions of law contained in that order were expressed in far greater detail than what the court announced from the bench on December 2, the order echoed the findings of fact and conclusions of law the court made that day.

During the hearing on Peoples's motion to suppress, Short renewed his August 19 motion to dismiss the indictment. He contended once again that the State had breached its promise to give Peoples immunity for having revealed the location of the victims' bodies and agreeing to a polygraph examination. Short rested his motion on the evidence presented to the court at the October 4 hearing. After hearing further argument on the motion—which, in essence, replicated the arguments the parties made at the October 4 hearing—the court denied it.

Following the court's denial of Peoples's motion to suppress, the State continued with its case-in-chief, during which time it introduced some of the tangible evidence that the motion had challenged under the fruit-of-the-poisonous-tree doctrine.[18] After the prosecution rested, the defense called two witnesses, Gooden and Peoples's mother, Rebecca. Short called Gooden as an adverse witness and, with leading questions, attempted to have him retract the testimony he gave in the State's case-in-chief—that Peoples had killed the Franklins. Gooden did not recant. Rebecca Peoples, though obviously sympathetic to the defendant, could say nothing to rebut the prosecution's case.[19]

The guilt phase of the trial concluded on December 7 with the jury's verdicts of guilty on all counts. The penalty phase of the case began, and ended, the same day. The State rested its case on the evidence presented during the guilt phase; the defense called four witnesses. They attested to Peoples's good character and urged the jury to spare Peoples's life. By a vote of eleven to one, the jury recommended the death penalty on all five counts.

---

[18] This tangible evidence is described in Part I, supra.

[19] Under cross-examination, Rebecca Peoples could not recall whether a few days after the Franklins' disappearance, on July 10, Peoples had responded to her request for money—to pay some of Peoples's bills—by showing her a large wad of cash. She did acknowledge, however, that on the morning of July 11, when her son was informed in her presence that police were looking into the disappearance of the Franklin family (whose car he was driving), his only response was, "I'll take care of it."

On January 27, 1984, the court convened a sentencing hearing. As required by Alabama law, Ala. Code § 13A-5-47 (1975),[20] the court reviewed the jury's sentencing recommendations and heard argument of counsel. The court thereafter entered its "Findings of Fact in Regard to the Punishment Phase of the Trial." It found that "the aggravating factors far outweigh the mitigating circumstances" and that the death penalty was the appropriate punishment.[21] Accordingly, the court sentenced Peoples to death on each count of the indictment.

---

[20] The statute reads as follows:

> (a) After the sentence hearing has been conducted, and after the jury has returned an advisory verdict, or after such a verdict has been waived as provided in Section 13A-5-46(a) or Section 13A-5-46(g), the trial court shall proceed to determine the sentence.

> (b) Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.

> (c) Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case. The order of the arguments shall be the same as at the trial of a case.

[21] The court found the following aggravating circumstances: (1) the "capital offense was committed while the appellant was engaged . . . in the commission of . . . or flight after committing . . . robbery," Ala. Crim. Code § 13A-5-49(4) (1975); and (2) the "capital offense was especially heinous, atrocious or cruel compared to other capital offenses," Ala. Crim. Code § 13A-5-49(8) (1975). The court determined that the only mitigating circumstance was the absence of a prior criminal record. See Ala. Crim. Code § 13A-5-51 (1975).

23

C.

On February 1, 1984, Peoples moved the court for a new trial. The motion reiterated what Short had asserted (1) in his August 19 motion to dismiss the indictment which was heard on October 4, and (2) in his August 19 motion to suppress evidence which the court considered on December 1-2 during the State's case-in-chief. The motion also cited some "new evidence" the State had disclosed during the sentencing hearing of January 27. This new evidence concerned an arrest warrant issued by the magistrate of the Childersburg Municipal Court, Ella Williams, on July 12, 1983, which charged Peoples with a misdemeanor—issuing a worthless check on October 12, 1982 to "Dennis Auction" in the amount of $221.68.[22] Someone had changed the warrant's date to indicate that it issued on July 10 rather than July 12. According to Short, the warrant had a bearing on whether Peoples was under a lawful arrest and in custody at the time he arrived at the Childersburg police station to meet Chief Finn on July 11.

On March 12, 1984, the court held an evidentiary hearing on the motion. What became clear during the hearing was this: When Chief Finn testified at the suppression hearing the previous December, he said that he told Peoples—after he arrived at the jail—that he had a warrant for a bad check Peoples had given "Mr.

---

[22] This warrant was not introduced into evidence at Peoples's trial.

Dennis at the auction barn." See supra Part II.B. As it turned out, and as the court found in its written order denying Peoples's motion for a new trial,[23] the warrant did not issue on July 10; instead, it issued on July 12, the day Ella Williams signed it. She changed the date to July 10 at Chief Finn's request.[24] In its order, the court found as fact that when Peoples asked if he was being "arrested, Chief Finn told him no." The court further found that Chief Finn did not have the warrant in his possession on July 11 and could not have arrested Peoples on the bad check charge that day.[25] However, as the court indicated in its order, the back-dated warrant had no bearing on its decision to deny Peoples's motion to suppress. The court subsequently denied Peoples's motion for a new trial.

## D.

Peoples appealed his convictions and death sentences to the Alabama Court of Criminal Appeals. That court affirmed, Peoples v. State, 510 So. 2d 554 (Ala.

---

[23] The court entered the order on March 12, 1984, following the hearing on Peoples's motion for a new trial.

[24] In addition to her job as magistrate, Ella Williams also served as Chief Finn's secretary. Her testimony during the evidentiary hearing on Peoples's motion for a new trial, indicated that she modified the date on the warrant after Chief Finn told her to "take care of" a filing error she had pointed out to the Chief concerning the date on the worthless check warrant.

[25] In Alabama, a police officer lacks the authority to effect a misdemeanor arrest without a warrant unless the arrestee commits the offense in the officer's presence. See Ex Parte Talley, 479 So. 2d 1305, 1306 (Ala. 1985) ("For an arrest to be valid on a misdemeanor offense which was not witnessed by the arresting officer, the officer must have an arrest warrant in his possession at the time of arrest.").

Crim. App. 1986), and the Alabama Supreme Court affirmed as well, Ex parte

Peoples, 510 So. 2d 574 (Ala. 1987). The United States Supreme Court thereafter

denied Peoples certiorari review. Peoples v. Alabama, 484 U.S. 933, 108 S. Ct.

307, 98 L. Ed. 2d 266 (1987).

E.

On January 19, 1988, Peoples petitioned the Talladega County Circuit Court

for relief from his convictions and sentences pursuant to Rule 20 of the Alabama

Rules of Criminal Procedure.[26] His petition contained eleven claims, eight of

which the court found to be barred from review at least in part because they "were

raised and decided on appeal from Peoples's conviction[s] and death sentence[s,]"

or "were not raised at trial or on appeal but could have been." See Peoples v.

State, 565 So. 2d 1177, 1180, 1181(Ala. Crim. App. 1990). The court therefore

addressed the merits of only three claims, one of which we consider today:

whether Ray Robbins's pre-indictment performance as Peoples's attorney deprived

Peoples of his Sixth and Fourteenth Amendment right to the effective assistance of

---

[26] Rule 20 refers to the Temporary Rule 20 of the Alabama Rules of Criminal Procedure (hereafter "Rule 20"). This rule is now Rule 32 of the Alabama Rules of Criminal Procedure. Peoples's petition was assigned to the same circuit judge who presided over the prosecution of Peoples's case.

counsel. Following a two-day evidentiary hearing, the court entered a comprehensive Memorandum Order denying Peoples's petition.[27]

The court of criminal appeals affirmed the circuit court's decision, id. at 1180, and the Alabama Supreme Court denied certiorari without opinion. Ex parte Peoples, 1990 Ala. LEXIS 460 (Ala. Jun. 22, 1990). The United States Supreme Court thereafter denied certiorari review. Peoples v. Alabama, 498 U.S. 973, 111 S. Ct. 443, 112 L. Ed. 2d 425 (1990).

### F.

On September 6, 1994, having exhausted his state court remedies, Peoples filed the instant petition for habeas corpus relief. His petition contained twenty-six claims of constitutional error.[28] After receiving and considering the State's

---

[27] The order appears as an Appendix to the court of criminal appeals decision in Peoples, 565 So. 2d at 1180-86.

[28] The twenty-six claims were based on the Fifth, Sixth, and/or Eighth Amendments and the Due Process Clause of the Fourteenth Amendment. Reduced to their essence, they allege the following: (1) Peoples was medicated from the moment the Childersburg police contacted him until after the jury returned its verdicts and, therefore, was unable to assist counsel in the defense of his case; (2) the Childersburg police arrested Peoples outside Wesson's Pharmacy without probable cause, and the evidence used to convict him was the product of such unlawful arrest; (3) Chief Ira Finn obtained the bill of sale and tag receipt for the Corvette during a custodial interrogation at the Childersburg jail without advising Peoples of his Miranda rights; (4) Chief Finn obtained Timothy Gooden's identification from Peoples during that interrogation; (5) the law enforcement officers investigating the case obtained Peoples's car, papers, clothing, and boots as a result of that unlawful interrogation; (6) the trial court erred in denying Peoples's motion to suppress the evidence mentioned in (3), (4), and (5) above, along with the evidence found at the crime scene, because all such evidence was the product of Peoples's illegal arrest and subsequent unlawful interrogation at the Childersburg jail; (7) the trial court erred in denying

27

response to the petition, the district court concluded that Peoples's claims were either foreclosed by the state court rulings on the merits or procedurally barred and therefore denied Peoples's petition without an evidentiary hearing. Peoples thereafter filed a notice of appeal and applied to the district court for a certificate of probable cause ("CPC") under the version of 28 U.S.C. § 2253 in place before

---

Peoples's motion to suppress his statement of July 19, 1983; (8) the trial court erred in denying Peoples's motion to suppress his July 22, 1983 statement regarding the location of the purported murder weapon; (9) the trial court erred in denying Peoples's motion for a change of venue; (10) the trial court's restrictions on the voir dire examination of the jury venire denied Peoples a fair trial; (11) the prosecutor discriminated on the basis of race in exercising the State's peremptory challenges; (12) the trial court erred in denying Peoples's motion for a mistrial during the voir dire of the venire after the prosecutor referred to the possibility that Peoples might not testify; (13) the trial court erred in refusing to excuse for cause venireman Chastain, a reserve Taladega County deputy sheriff who participated in the investigation of the case; (14) the prosecutor's conduct throughout the trial proceedings was pervasively abusive and denied Peoples a fair trial; (15) Peoples's convictions are based on Timothy Gooden's false testimony; (16) the State's conduct in seizing a tape recorder belonging to defense counsel's investigator unduly impaired Peoples's defense; (17) the trial court's refusal to quash the State's subpoena of defense counsel's investigative assistant impaired Peoples's defense; (18) the trial court erred in admitting into evidence an unauthenticated hospital record to connect one of the victims to the murder weapon; (19) the trial court's jury charge in the penalty phase of the trial created the impression that the jury could draw an adverse inference from the defendant's failure to testify; (20) the State presented no evidence that Paul Franklin, Sr. was murdered, thus invalidating Peoples's three murder convictions relating to his death; (21) the trial court erred in the sentencing phase of the trial by allowing the prosecutor to question defense witnesses about a felony charge pending against Peoples and an allegation that he had issued a worthless check; (22) the trial court erred in finding aggravating circumstances and imposing the death sentences; (23) the jury was exposed to extra record information concerning the Franklin family and was thereby rendered partial; (24) the trial court denied Peoples a fair trial by sequestering the jury; (25) the performance of Peoples's attorney prior to Peoples's indictment fell below the minimum standard for constitutionally effective counsel; (26) the performance of Peoples's attorney at trial, on appeal, and in post-conviction proceedings fell below the minimum standard for constitutionally effective counsel.

28

the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). The district court granted the CPC, and Peoples's appeal proceeded.

In Peoples v. Haley, 227 F.3d 1342, 1347 (11th Cir. 2000), we held that the district court erred in issuing a CPC in lieu of a certificate of appealability ("COA"). We therefore vacated the CPC and remanded the case to the district court for the issuance of a COA indicating "which specific issue or issues satisfy" the standard of a "substantial showing of the denial of a constitutional right" as required by AEDPA. 28 U.S.C. § 2253(c)(2), (3).[29] The district court issued a COA identifying two issues for our review: (1) Whether Peoples was illegally arrested in the early afternoon of July 11, 1983, outside Wesson's Pharmacy in Childersburg, and, if so, whether the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments[30] required that the evidence obtained as the result of such illegal

---

[29] Before April 24, 1996, the effective date of the AEDPA, a habeas petitioner who had been denied relief had to obtain a CPC from the district court in order to prosecute an appeal. See Tompkins v. Moore, 193 F.3d 1327, 1330 (11th Cir. 1999); 28 U.S.C. § 2253 (1994). The AEDPA, however, amended 28 U.S.C. § 2253 to require a petitioner to request a certificate of appealability ("COA") instead of a CPC. Unlike the procedure for the issuance of a CPC, under the amended version of section 2253, the district court, when granting a COA, must "indicate [for] which specific issue or issues" the petitioner has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2), (3).

[30] Although in his petition, Peoples provides us with a shotgun list of constitutional amendments allegedly violated by the police on July 6, 1983, he does not cite, nor do we find, evidence supporting his claim that his rights under the Eighth Amendment were violated. The Sixth Amendment also does not apply since that amendment does not attach until prosecution is

29

arrest should have been suppressed; and (2) Whether the Bill of Sale and tag receipt[31] for the 1968 Corvette should have been suppressed on the ground that Chief Finn obtained them from Peoples, while he was "in custody," without first advising him of his <u>Miranda</u> rights.

After obtaining this COA from the district court, Peoples applied to us for a COA on additional issues the district court had rejected. We partially granted his application and issued a COA on the following issues: (3) Whether, as the district court concluded, Peoples procedurally defaulted his claim that the State failed to prove that Paul Franklin was murdered and, if not defaulted, whether the district court should have granted relief on that claim; (4) Whether the district court correctly concluded that Peoples procedurally defaulted his claim that the performance of his trial and appellate counsel, William A. Short, Jr., was constitutionally ineffective and, if not defaulted, whether the claim is legally sufficient and should be remanded for an evidentiary hearing; (5) Whether Peoples procedurally defaulted part of his claim that the performance of his pre-indictment

commenced "by way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158 (1991). We discuss the applicability of the Fourth Amendment to Peoples's "illegal arrest" claim in Part IV.A, <u>infra</u>, and discuss the Fifth Amendment aspect of this argument in Part IV.B, <u>infra</u>.

[31] Since the tag receipt was not introduced into evidence at Peoples's trial, we treat issue (2) as addressing solely the admissibility of the Bill of Sale, which was introduced.

attorney, Ray Robbins, was constitutionally ineffective and, if not defaulted, whether such part should be remanded to the district court for an evidentiary hearing; (6) Whether with respect to the non defaulted part of Peoples's claim that Robbins rendered ineffective assistance, the district court correctly held that at the time Robbins represented Peoples, his constitutional right to effective assistance of counsel with respect to the murder charges had not yet attached.

## III.

As amended by AEDPA, 28 U.S.C. § 2254 states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

According to Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000),

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case

31

differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

The phrase "clearly established Federal law," as that term appears in section 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. at 412, 120 S. Ct. at 1523. Furthermore, a habeas petitioner can overcome a state court's "presumption of correctness" on factual determinations only by coming forth with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As a general rule, in reviewing a district court's grant or denial of a habeas petition, we review the district court's findings of fact for clear error, and review de novo both questions of law and mixed questions of law and fact. Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000). In this case, because the district court "neither held an evidentiary hearing nor made any independent findings of fact[,]" we review its holdings de novo, mindful that "we (like the district court) are reviewing, in essence, [the] decision[s] of the courts of [Alabama]." Putman v. Head, 268 F.3d 1223, 1240 (11th Cir. 2001).

With the foregoing principles in mind, we proceed to the six issues set out in the COA the district court and this court have granted.

32

IV.
A.

The first issue is whether the action of the Childersburg police in stopping Peoples at Wesson's Pharmacy and leading him back to the police station on July 11 amounted to an "illegal arrest" in contravention of his Fourth Amendment[32] right to be free from unreasonable seizure because they seized him without a warrant and lacked probable cause to believe that he had committed a felony. If the arrest was illegal, it would appear that the evidence gathered by law enforcement officials subsequent to this "illegal arrest" including (1) the Bill of Sale; (2) the blood-stained shirt and blue jeans; (3) Peoples's boots; (4) his disclosure of the location of the victims' bodies and Paul Franklin's .22 caliber Winchester rifle; and (5) the forensic analysis of physical evidence, should have been suppressed as the fruits of a poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The first hurdle Peoples must overcome to obtain our resolution of this claim is the well known rule that when "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

---

[32] The Fourth Amendment applies to States under the Fourteenth Amendment. See United States v. Davis, 313 F.3d 1300, 1302 (11th Cir. 2002) ("The Fourth Amendment, which is applicable to the states via the Fourteenth Amendment, guarantees that individuals will be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." (quotation marks omitted)).

33

granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037, 3052, 49 L. Ed. 2d 1067 (1976) (footnotes omitted). Thus, before we may review the merits of his Fourth Amendment claim, Peoples must demonstrate that the state courts deprived him of a full and fair opportunity to litigate the claim.

In Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990), we said this in applying Stone: "For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court." Peoples concedes that the Alabama trial and appellate courts "considered" his Fourth Amendment claim, but he contends that such consideration was not full and fair because the state courts employed "inconsistent" rationales in rejecting the claim. First, as Peoples correctly observes, the circuit court, in denying his motion to suppress, concluded that the police had probable cause to arrest him for theft of the Corvette on July 11, but (as we indicate in Part II.B, supra) failed to indicate precisely when on July 11 such probable cause arose. Second, the court of criminal appeals, in reviewing the circuit court's denial of Peoples's motion to suppress, concluded that Peoples was

34

arrested after Investigators Traylor and Harmon found the blood-stained clothing in his Talladega Downs apartment in the late afternoon of July 11—not hours before that at Wesson's Pharmacy. Peoples, 510 So. 2d at 569.[33] And third, the supreme court concluded that the officers' interaction with Peoples at Wesson's Pharmacy constituted a lawful Terry stop[34]—a holding the circuit court and the

---

[33] The court of criminal appeals reached this conclusion in the following passage:

> When [Peoples] was confronted at [Wesson's Pharmacy] and asked if the Corvette was his, the officers knew that the car matched the one listed with N.C.I.C. as being stolen. They asked [him] to accompany them to the police station to answer some questions about the car. He agreed, and voluntarily drove the car to the station. He produced the purported bill of sale, and shortly thereafter, the police learned that it was fraudulent; [Peoples] supposedly gave as consideration for the car, ownership in a supper club which [he] did not own. Additionally, [Peoples] talked to an attorney and told him that his services were not needed, that the police were simply checking out the car. [Peoples] voluntarily consented to the search of his apartment, wherein the blood stained blue jeans were found. Thereafter, [Peoples] was arrested. We find that there was probable cause for the arrest. We do not agree with [Peoples] that the arrest occurred when he was confronted in the [pharmacy] in Childersburg. Therefore, the above items of evidence were not inadmissible as fruit of the poisonous tree.

Peoples, 510 So. 2d at 569.

[34] See Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The supreme court phrased Peoples's argument that the officers' action could not be considered a valid Terry stop in this way:

> At the time [Peoples] was approached in the [pharmacy], Childersburg police knew that a man was at the drug store attempting to sell a red 1968 Corvette with a tag number and vehicle identification number identical to that of a missing car listed with the [NCIC]. They also knew that a car matching this description had been publicized in newspaper reports concerning a missing family in an adjoining county. [Peoples] claims this information was insufficient to warrant the action taken by the Childersburg police.

35

court of criminal appeals apparently neither reached nor even considered—which

encompassed Peoples's trip to the police station, the questions Chief Finn put to

him, and his presentment of the Bill of Sale in response to Finn's statement that

they wanted to know why the car was listed on the NCIC.  The supreme court

agreed with the court of criminal appeals that Peoples's arrest did not occur until

after Traylor and Harmon found the blood-stained clothing in Peoples's apartment.

Peoples cites no authority in support of his argument that he was not

afforded a full and fair hearing because the Alabama courts's analyses of his

Fourth Amendment claim were "inconsistent."  He acknowledges, as he should,

that the supreme court's analysis is coherent and that the court examined the

_____

Ex Parte Peoples, 510 So. 2d at 576.  Responding to Peoples's argument, the court concluded
that given the facts at hand, Peoples's "detention . . . was a valid investigatory stop," id. at 577,
and that his "detention . . . at the Childersburg police station was justified under the
circumstances."  Id.

> When [Peoples] told the officers that this car belonged to him, he became the
> legitimate subject of investigation.  At that point, it was appropriate to relocate the
> investigation to the police station, as good police work in this instance demanded
> that the officers have an extended conversation with [Peoples] concerning the
> particular car that he was attempting to sell. . . .  Having determined that the
> detention of [Peoples] was a valid investigatory stop, we find that the bill of sale
> produced by [him] during this stop was admissible.  Further, the facts which were
> uncovered as a result of information contained in the bill of sale supplied probable
> cause to arrest [Peoples] for theft of the automobile by deception.  The evidence
> obtained as a result of the valid investigatory stop and the subsequent arrest of
> [Peoples] based on probable cause was properly admitted into evidence.

Id. (citation omitted).

relevant evidence step by step. The court began its analysis by reviewing the circumstances of the officers' engagement with Peoples at Wesson's Pharmacy and then examined what transpired in Chief Finn's office. Then, the court examined what took place at Peoples's Talladega apartment, where the inspectors found the blood-stained clothing. The final element of the Tukes standard is a meaningful appellate review. We have no difficulty in concluding that Peoples obtained meaningful review here. As for the initial element, the record reveals that Peoples had an exhaustive evidentiary hearing of his Fourth Amendment claim on three separate occasions. The first occurred on October 4, 1983. Although the court scheduled the October 4 hearing to take up Peoples's motion to dismiss the indictment (on the ground that the State had granted him immunity from prosecution), the circumstances of Peoples's interaction with the police at Wesson's Pharmacy, Chief Finn at the police station, and Investigators Traylor and Harmon later in the day (in Childersburg, Talladega, and the St. Clair County jail) were presented in considerable detail. The second occasion occurred during trial on December 1 and 2. The third took place on March 12, 1984, when, in considering Peoples's motion for a new trial, the court resolved the controversy over whether the bad check warrant for Peoples's arrest was issued on July 10 or

July 12.[35]  Peoples, therefore, has had ample opportunities to examine his Fourth

Amendment claims in state court.

In sum, if ever there was a case for the application of the Stone v. Powell

doctrine, this is it.  See Cardwell v. Taylor, 461 U.S. 571, 572, 103 S. Ct. 2015,

2016, 76 L. Ed. 2d 333 (1983) (per curiam) (finding the Stone v. Powell doctrine

applicable where the defendant "argued that evidence used in his trial was the

product of an illegal arrest"); Dortch v. O'Leary, 863 F.2d 1337, 1342 (7th Cir.

1988) (refusing to reverse state court's Fourth Amendment rulings concerning

evidence that was derived from an allegedly illegal arrest because "it is precisely

this type of consideration [that] Stone v. Powell precludes.") (citation and

quotation marks omitted); Jones v. Superintendant of Rahway State Prison, 725

F.2d 40, 42 (3d Cir. 1984) (holding that "consideration of a claim that evidence

admitted at trial was the fruit of an illegal arrest could not be considered on a

habeas corpus petition so long as the state courts had afforded a full and fair

opportunity to litigate that claim.").  As the district court correctly observed, the

doctrine requires that we stay our hand, and we do so.

---

[35]  At the end of the day, it appears that the controversy over whether the warrant was back-dated and by whom is a red herring.  The circuit judge, in denying Peoples's motion for a new trial, stated that the warrant played no role—one way or the other—in his decision to deny Peoples's motion to suppress.

B.

The second issue we address assumes that Peoples was not under arrest while he and Chief Finn were discussing his acquisition of the Corvette and asks whether Peoples was nevertheless "in custody" at the time. If Peoples was in custody, Chief Finn was required to advise him of his Miranda rights before the interview began; otherwise, what Peoples told him about the car and the Bill of Sale (which was part and parcel of what Peoples said) were inadmissible. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Peoples did not raise this issue in the state courts until he filed his brief to the Alabama Supreme Court after that court granted his petition for a writ of certiorari.[36] In his brief, under Issue XIV, Peoples contended that he was in custody while at Chief Finn's office and that Finn should have advised him of his Miranda rights before asking him any questions (Peoples's "Miranda claim"). The supreme court did not mention Issue XIV in its opinion affirming the court of criminal appeals judgment, however. After addressing two of the fifteen issues Peoples presented in his brief—whether his "detention on July 11, 1983, by the Childersburg police amounted to an illegal arrest" and whether the "evidence from

---

[36] The supreme court granted Peoples's petition as a matter of right for the purpose of reviewing the court of criminal appeals's decision affirming Peoples's convictions and sentences. Ex parte Peoples, 510 So. 2d at 575.

39

the scene where the bodies . . . were found should not have been admitted"—the supreme court stated that it had "carefully reviewed the remaining issues," Ex parte Peoples, 510 So. 2d at 575, 577, 578, and had found them insufficient to require the reversal of Peoples's convictions or sentences.  We read this statement to mean that the supreme court both considered and rejected Peoples's Miranda claim on the merits.

Because the supreme court's opinion gave no indication as to why it denied Peoples's Miranda claim, the question becomes whether the district court in the first instance, and this court on appeal, should give the supreme court's decision any deference under 28 U.S.C. § 2254(d)(1).  Specifically, did the supreme court's denial of Peoples's Miranda claim constitute an "adjudication" within the meaning of § 2254(d)(1)?  If not, the court's ruling is entitled to no deference.

Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245 (11th Cir. 2002), cert. denied, 538 U.S. 906, 123 S. Ct. 1511, 155 L. Ed. 2d 225 (2003), addressed the question we pose: "whether [a] state court's summary, which is to say unexplicated, rejection of the federal constitutional issue qualifies as an adjudication under § 2254(d) so that it is entitled to deference[,]"  and answered it as follows, "all that is required [to accord the state court's decision deference] is a rejection of the claim on the merits, not an explanation."  Id. at 1254-55.  The

40

Supreme Court of Alabama rejection of Peoples's <u>Miranda</u> claim therefore qualifies as an adjudication on the merits. <u>See</u> <u>Ex parte Peoples</u>, 510 So. 2d at 575, 577, 578. The district court's task, then, in considering this claim was to determine whether the supreme court's rejection of the claim constituted a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts. . . ."). 28 U.S.C. § 2254(d)(1),(2).

When it ruled on Peoples's habeas petition, the district court did not have the benefit of our <u>Wright</u> decision. The court therefore answered for itself the question of whether Peoples was in custody while in Chief Finn's office and, thus, whether Finn should have advised him of his <u>Miranda</u> rights.[37] The court looked to the record of the evidentiary hearings held by the trial court on Peoples's motions to dismiss the indictment, to suppress evidence, and for a new trial—as well as the opinions of the court of criminal appeals and the supreme court—for the factual basis it needed to decide whether Peoples was in custody. First, the district court accepted the supreme court's finding that Peoples was not arrested

---

[37] In doing so, the court overlooked the fact that the Alabama Supreme Court had answered that question, albeit without explication, and therefore gave the answer no § 2254(d)(1) deference.

until sometime after he left the Childersburg police station in the afternoon of July 11.[38]  Second, the court agreed with the finding of all of the Alabama courts that Chief Finn told Peoples that he was not under arrest.  Weighing the circumstances as a whole, the district court found that Peoples "was not under arrest nor was there a 'restraint on his freedom of movement of the degree associated with a formal arrest' when he produced the bill of sale to Chief Finn."  Finally, applying the test established by the Supreme Court in Thompson v. Keohane, 516 U.S. 99, 101, 116 S. Ct. 457, 460, 133 L. Ed. 2d. 383 (1995), the court concluded that Peoples was not in custody; hence, a Miranda warning was not required.

We agree with the district court's Thompson analysis of Peoples's Miranda claim.  In Thompson, the Supreme Court held that two inquiries are essential to the determination of whether a person is "in custody" for Miranda purposes.  The first examines "the circumstances surrounding the interrogation[,]" Thompson, 516 U.S. at 112, 116 S. Ct. at 465; the second is whether a reasonable person would have felt that he was "at liberty to terminate the interrogation and leave." Id.  With respect to the first inquiry, the circumstances surrounding Peoples's initial encounter with officers at Wesson's Pharmacy and his subsequent meeting

---

[38]  The supreme court's finding on this issue contained both findings of fact—concerning the relevant circumstances—and a conclusion of law—concerning the legal effect of the findings of fact.

with Chief Finn fell far short of the level of "governmental coercion" that lies at the center of Fifth Amendment-based, <u>Miranda</u> concerns. See <u>Colorado v. Connelly</u>, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473 (1986) ("The sole concern of the Fifth Amendment, on which <u>Miranda</u> was based, is governmental coercion.").

The Alabama Supreme Court found that Peoples voluntarily went to the Childersburg Police Department to discuss the red 1968 Corvette after he was told by Captain Lewis Finn that the car had been reported on the NCIC used to track missing or stolen cars. Peoples drove himself to the police station, albeit with an officer accompanying him in the passenger seat, <u>Ex parte Peoples</u>, 510 So. 2d at 576, and he parked the car in a lot adjacent to the station. Shortly after Peoples arrived at the station, Chief Finn told him that he was not under arrest. <u>Id.</u> Although a police officer's subjective view concerning whether an individual who is being questioned is in custody generally does not bear upon the question whether the individual is in custody for purpose of <u>Miranda</u>, it is relevant where the officer conveys such knowledge or belief to the individual being questioned. <u>Stansbury v. California</u>, 511 U.S. 318, 325, 114 S. Ct. 1526, 1530, 128 L. Ed. 2d 293 (1994) (per curiam) (holding that an officer's subjective beliefs are relevant to

43

the extent they affect how a reasonable person in the petitioner's situation would perceive whether he or she was free to leave or end the interview).

These circumstances, as presented in the state courts's findings, indicate that a reasonable person in Peoples's situation would not have felt restrained or "deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. Chief Finn had known Peoples all of Peoples's life; the grandfather of Mrs. Finn (Chief Finn's wife) was the brother of one of Peoples's grandfathers, and Peoples's parents lived in Childersburg, a small town of less than 5,000 inhabitants. Peoples had a habit of issuing bad checks, and when they came to Chief Finn's attention—because the check's recipient got a warrant for Peoples's arrest—Finn would call Peoples's father and the check would be covered.[39] Under the circumstances, Peoples had no reason to believe that his "freedom of action" was limited as a result of duress imposed by governmental coercion.

What Peoples did shortly after leaving Chief Finn's office bears this out. Answering the telephone call from his attorney, Ray Robbins, Peoples told Robbins that he did not need his assistance because he and the police were merely

---

[39] Chief Finn testified to this at the hearing on Peoples's motion for a new trial. See supra note17.

44

discussing the car he had purchased from his friend, Paul Franklin.[40]  At most, the actions of the Childersburg police in the early afternoon of July 11 constituted "traditional investigatory functions of police where the compulsive atmosphere triggering <u>Miranda</u> is absent."  <u>Sullivan v. Alabama</u>, 666 F.2d 478, 482 (11th Cir. 1982) (quotation marks omitted).  Peoples was not compelled to remain at the station, nor, as his phone conversation with his attorney reveals, did he feel under constraint or duress.  Instead, he willingly spoke with Chief Finn and voluntarily produced the Bill of Sale shortly upon his arrival.

In <u>Sullivan</u>, we found that the appellant was not in custody, and therefore not entitled to <u>Miranda</u> warnings, where a police officer's "initial inquiry was merely an attempt to investigate and probe the situation," and the appellant "remained at the station of his own accord and freely answered the questions asked of him."  <u>Id.</u> at 482.  This reasoning applies with similar force to Peoples's claim before us, particularly since Peoples knew from Chief Finn that he was not under arrest when he volunteered to provide Finn with information about the Corvette.

---

[40]  Although the record contains no direct evidence on the point, it admits of strong circumstantial evidence that before Peoples arrived at his office, Chief Finn called Peoples's father and explained why Peoples was coming down to the police station.  Peoples's father then called Robbins, who (according to testimony in the record) was representing Peoples in another unrelated matter, and Robbins called Peoples at the Childersburg police station.

Because Peoples's interactions with the police officers prior to his disclosure of the purported Bill of Sale fall far short of resembling "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," Peoples's rights under the Fifth Amendment were not violated. California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983) (quotation marks omitted). Hence, the Alabama Supreme Court correctly rejected Peoples's claim. Moreover, we could hardly say that the supreme court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[41] 28 U.S.C. 2254(d)(1); see Beheler, 463 U.S. at 1125, 103 S. Ct. 3517 (holding that defendant was not in custody for Miranda purposes when police told him he was not under arrest even though the police questioned him at the police station). We therefore affirm the district court's denial of Peoples's Miranda claim.

C.

_____

[41] We also note that a contrary ruling, which would allow individuals to brazenly volunteer information to officers, and then later strike that volunteered information from the record because it was made before officers recited to him or her a Miranda warning—because the individual was not yet in custody at the time—would unwisely handicap law enforcement while providing shrewd criminals with a potential roadmap for evading conviction. See Moran v. Burbine, 475 U.S. 412, 430, 106 S. Ct. 1135, 1145-46, 89 L. Ed. 2d 410 (1986) ("The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequence of his own candor.").

46

The third issue to be addressed concerns the district court's ruling that Peoples procedurally defaulted his claim that the State failed to prove that Paul Franklin was murdered.[42]  In Jackson v. Virginia, 443 U. S. 307, 324, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979), the Supreme Court stated,

> in a challenge to a state criminal conviction brought under 28 U. S.C. § 2254 —if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

Peoples concedes that he failed to satisfy the "procedural prerequisites" for his Jackson claim[43] by not challenging the sufficiency of the evidence on the Paul Franklin murder counts[44] before the Alabama appellate courts when he appealed his convictions.  He attempts to circumvent this procedural default by contending that permitting his conviction for Paul Franklin's murder to stand would amount to a "fundamental miscarriage of justice" and "the conviction of one who is actually

---

[42]  In support of this claim, Peoples points out that the State physician who conducted Paul Franklin's autopsy was unable to determine the exact cause of Paul Franklin's death.  He also notes that the Franklin was in poor health.

[43]  Peoples has not cited Jackson v. Virginia in pursuing his challenge to the sufficiency of the evidence on the counts charging him with Paul Franklin's murder.  Nonetheless, Jackson established the standard we use in evaluating Peoples's claim.

[44]  Three counts are at issue here: (1) Count II charging Peoples with the murder of Paul G. Franklin, Sr., during the commission of a first degree kidnaping; (2) Count IV implicating Peoples in the murder of Paul G. Franklin, Sr., during the course of a first degree burglary; and (3) Count V charging Peoples with the murder of Paul G. Franklin, Sr., during the course of a first degree robbery.  See supra note 1.

47

innocent [of the murder]." Murray v. Carrier, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986).[45]

The district court concluded that the circumstantial evidence adduced at Peoples's trial demonstrated that Peoples was not "actually innocent" of Paul Franklin's murder. The court focused on the following evidence:

> Peoples gagged and blindfolded Mrs. Franklin and Paul Franklin, Jr. and then took Mr. Franklin downstairs. Following a 'commotion' downstairs, Gooden (the accomplice and co-defendant) took Mrs. Franklin and Paul Franklin, Jr. downstairs where he found Mr. Franklin lying prone on the floor. Gooden and Peoples then drove the Franklins to the wooded area in Talladega County. After dragging Mr. Franklin into the woods and then leading his wife and child into the woods, as well, the overwhelming evidence showed that Peoples proceeded to brutally murder Mrs. Franklin and Paul Franklin, Jr. Although the exact cause of death of Mr. Franklin was never determined, significant circumstantial evidence exists to support the theory that Peoples was actually guilty as opposed to actually innocent of the murder of Paul Franklin, Sr.

Peoples v. Haley, No. 98-6882, mem. op. at 32 (N.D. Ala. Sept. 30, 1998)

(emphasis in the original).

---

[45] Under Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506, 53 L. Ed. 2d 594 (1977), a federal habeas court can excuse a petitioner's procedural default if the petitioner can show cause for the default and resulting prejudice. Murray v. Carrier, as indicated in the text, provides a second excuse: habeas relief can be granted on a defaulted claim if the petitioner can show that he is "actually innocent" of the offense at issue. 477 U.S. at 496, 106 S. Ct. at 2649. In the district court, Peoples initially attempted to excuse his default by contending that his attorney rendered ineffective assistance of counsel when he failed to challenge on direct appeal the sufficiency of the evidence to convict Peoples on the counts involving Paul Franklin. For reasons discussed elsewhere in this opinion, see Part IV.D, infra, this argument is foreclosed.

We find no error in the district court's conclusion that the evidence presented to the jury during Peoples's trial was sufficient to convict Peoples of Paul Franklin's murder. In Jackson's language, Peoples has not shown that "upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324, 99 S. Ct. at 2791-92. The district court's rejection of Peoples's Jackson claim is therefore affirmed.

D.

The next issue we address concerns Peoples's claim that the performance of his attorney, William A. Short, Jr., in preparing for trial, at trial, and on appeal, failed to satisfy the Sixth Amendment's effective-assistance-of-counsel standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[46] The district court found the claim procedurally barred and thus refused to entertain it on the merits because (1) Peoples failed to bring the claim to the attention of the Alabama courts; (2) Rule 20 would preclude the Alabama courts from considering the claim at the time Peoples filed the instant habeas petition; and (3) Peoples had not established a lawful basis for excusing the default. Peoples concedes point (2) but questions the district court's rulings on

---

[46] The Sixth Amendment applies to States via the Fourteenth Amendment. Lumley v. City of Dade City, 327 F.3d 1186, 1194 n.21 (11th Cir. 2003)(citing Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)).

49

points (1) and (3). As we explain in the ensuing discussion, the district court erred in concluding that Peoples procedurally defaulted his claim. We reach this holding not because we agree with Peoples—that he presented the claim to the Alabama courts—but because the Alabama Court of Criminal Appeals declined to enforce the procedural default rule that applies in Rule 20 proceedings.

Peoples contends that "a close reading" of the court of criminal appeals opinion, which affirmed the circuit court's denial of his Rule 20 petition, reveals that he presented his ineffective assistance claim to the Alabama courts. He cites the following statement from the court of criminal appeals opinion in support:

> [Peoples,] in addition to the matters which were set forth in the original trial, sought to assert that his trial counsel was inadequate and ineffective as a matter of law and, secondly, that trial counsel failed to properly raise the issues on original direct appeal and that he, therefore, was not effectively represented on appeal of the original conviction.

Peoples, 565 So. 2d at 1179. This statement, if established by the record before the court of criminal appeals, appears to vindicate Peoples's position. The problem, however, is that there is no record support for the statement.

We begin with Peoples's Rule 20 petition. The petition, which was drafted and filed by Short, contained eleven claims.[47] The circuit court dismissed seven of

---

[47] The eleven claims are described in the circuit court's Memorandum Opinion that accompanied the order denying Peoples Rule 20 relief. As noted earlier, the Memorandum Opinion is Appendix A to the court of criminal appeals's opinion affirming the circuit court's order.

the claims on the ground that they were barred from review because they had been raised and decided in Peoples's appeal of his convictions, and it dismissed one of the claims because it should have been raised at trial or on direct appeal. Id. at 1180-81. The court dismissed the three remaining claims on the merits following an evidentiary hearing. Id. at 1181-86. One of those claims challenged the representation Ray Robbins provided Peoples between the evening of July 11 (after Peoples had been arrested for theft of the Corvette and taken to the St. Clair County jail) and July 19 (when Peoples confessed to Sheriffs Brown and Studdard at the Ashville County Jail). However, none of the claims challenged the representation Short provided Peoples in the trial court or on appeal. Nevertheless, because it is possible that the issue of Short's performance arose during the evidentiary hearing, we examine the record of that hearing.

After it received the Rule 20 petition, the State filed a motion with the circuit court requesting that the court advise Peoples of his right to bring an ineffective assistance of counsel claim against Short. At the hearing, Short addressed the State's motion and stated that he had no qualms with the court asking Peoples if he was satisfied with his performance. The court then informed Peoples of his Sixth Amendment rights and explained that a claim challenging

---

Peoples, 565 So. 2d at 1180-86.

51

Short's performance would apply "just for the trial and for the appeal up to the time the U.S. Supreme Court said they weren't going to hear your case." The court next asked Peoples if he was unsatisfied with Short's representation. Peoples replied that he had no problem with Short's performance up until that point and that he wanted Short to continue as his attorney. When the court asked, "So, you want to go forward with Mr. Short as your lawyer? You are not going to raise this Rule 20 Motion which is relative to ineffective counsel relative to Mr. Short on all the proceedings we've had up until now?" Peoples responded, "No, sir." The court then stated, "You're satisfied with him? Then the Court is satisfied with him." Peoples responded, "Yes, sir. Most definitely."

With the exception of the State's brief and Peoples's colloquy with the circuit judge, the record of the Rule 20 proceeding in the circuit court contains no reference to the constitutional adequacy of Short's performance. Neither does the Memorandum Opinion that accompanied the circuit court order denying Peoples Rule 20 relief. And there is nothing in the brief Short filed with the court of criminal appeals to indicate that Peoples was somehow troubled with his representation at the trial and appellate stages of the criminal prosecution. It is conceivable, though, that later, during the give and take of oral argument before the court of criminal appeals, the court questioned Short about his handling of the

case.[48]  This is highly unlikely, however, given the colloquy that took place between the circuit court and Peoples immediately before the hearing on his Rule 20 petition began, when Peoples said he was completely satisfied with Short's representation.

We find that the court of criminal appeals most likely considered the constitutionality of Short's performance as part of its perceived duty, under Rule 45A of the Alabama Rules of Appellate Procedure, to examine "the record" for plain error.[49]  See id. at 1179 ("This court, as required by Rule 45A, A.R.A.P., has carefully reviewed the record in this cause.").  Rule 45A mandates that

> In all cases in which the death penalty has been imposed[, the appeals court shall] notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

---

[48]  The court or criminal appeals opinion does not indicate that Peoples's case received oral argument, and the record is silent on the issue.  We therefore assume for purposes of discussion that the court granted oral argument.

[49]  The court misread the Rule 45A's requirement according to decisions the court and the supreme court subsequently handed down.  In Neelley v. State, 642 So. 2d 494, 496 (Ala. Crim. App. 1993) the court observed that "it is well settled that the plain error rule applies only on direct appeal and not in collateral review proceedings." Similarly, in Ex parte Dobyne, 805 So. 2d 763, 766 (Ala. 2001), the court emphasized that Rule 45A's plain error rule does not apply in collateral proceedings.

Ala. R. App. P. 45A. (emphasis added).[50] The court of criminal appeals interpreted "proceedings under review" to include not only the record of the Rule 20 proceedings in the circuit court, but also the record of the criminal prosecution—at both the trial and appellate stages—as well. Thus, in examining "the record" of such "proceedings" for plain error, the court felt duty bound to determine whether Short had denied Peoples his constitutional right to effective assistance of counsel at any time during the criminal prosecution or the Rule 20 proceeding. This is evidenced by the court's statement that Peoples was "fully and fairly represented, not only at original trial and on original appeal, but also at the Rule 20 petition hearing and in his appeal of that proceeding which is presently before the court." Peoples, 565 So. 2d at 1180 (emphasis added).[51] Adhering to its apparent interpretation of Rule 45A, the court analyzed and evaluated whether Short's representation of Peoples was constitutionally deficient at any time. It answered the question as follows:

---

[50] A similar plain error rule operates with respect to petitions for certiorari filed in the Alabama Supreme Court in death penalty cases, pursuant to Rule 39(a)(2) of the Alabama Rules of Appellate Procedure. See Ex parte Dobyne, 805 So. 2d 763, 766 (Ala. 2002).

[51] We note that it is well settled in Alabama that there is no Sixth Amendment right to effective assistance of counsel in post-conviction proceedings, which are civil in nature. Mayes v. State, 563 So. 2d 38, 38 (Ala. 1993) ("This [Sixth Amendment] guarantee to the assistance of counsel does not extend to collateral or post-conviction proceedings because they are civil in nature." (citation omitted)).

We have also carefully considered [Peoples's] assertions with reference to his representation by counsel. We are clear to the conclusion that [Peoples] failed to make out a case of either inadequate or ineffective representation by counsel at trial or on original appeal. [Peoples], in his proof, wholly failed to satisfy either prong as set forth in the opinion of the Supreme Court of the United States in Strickland v. Washington. . . .

We have carefully reviewed this record again, and the original trial record, with reference to [Peoples's] contentions concerning the ineffective assistance of counsel on his first appeal as a matter of right . . . . Our own independent search of the record in this cause leads us to the conclusion that the circuit court's findings of fact and conclusions of law . . . correctly determine the issues in the trial court. . . .

[I]n an abundance of precaution, we have carefully reviewed each allegation and assertion made by Peoples. We have carefully considered the work of his counsel on this appeal. We find that [Peoples] was fully and fairly represented, not only at original trial and on original appeal, but also at the Rule 20 petition hearing and in his appeal of that proceeding which is presently before this court. We commend the attorneys involved as representing the best traditions of the bar of the State of Alabama. [Peoples's] contention as to inadequate or ineffective representation is utterly without merit as [sic] matter of fact and law.

Id.[52]

---

[52] After the court of criminal appeals affirmed the circuit court's Rule 20 disposition, Short petitioned the court for rehearing. The court summarily denied the petition. Short then unsuccessfully sought certiorari review in the Alabama Supreme Court and in the United States Supreme Court. In none of these instances did he take issue with the court of criminal appeals's statements that his performance at Peoples's trial and on direct appeal fully satisfied the Sixth Amendment requirement articulated in Strickland v. Washington.

We are thus presented with a unique situation where, in reviewing the denial of post-conviction Rule 20 relief, the court of criminal appeals not only addressed and denied an ineffective assistance claim the petitioner never raised[53]—and actually waived in open court—but it disregarded the Alabama rule that claims not presented in a Rule 20 petition are not cognizable on appeal. See Thompson v. State, 581 So. 2d 1216, 1219 (Ala. Crim. App. 1991) (citing Jackson v. State, 501 So. 2d 542 (Ala. Crim. App. 1986); Boatwright v. State, 494 So. 2d 929 (Ala. Crim App. 1986)). Since Peoples did not challenge Short's effectiveness in his Rule 20 petition, he was barred from raising the challenge in the first instance on appeal. And, as noted in the margin, supra note 49, Rule 45A precluded the court in a Rule 20 proceeding from examining the trial and appellate stages of Peoples's prosecution in an effort to find evidence that Short had deprived his client of a Sixth Amendment right.

The district court concluded that the court of criminal appeals's search for such evidence did not relieve Peoples of his procedural default in not including the

---

[53] Although Peoples draws our attention the court of appeals passages we have set out in the text, he cites nothing in the record to substantiate his position that he explicitly challenged the constitutionality of Short's performance. Instead, he merely argues that his colloquy with the court during his Rule 20 petition did not amount to a "waiver" of this argument. Peoples also has not pointed us to a case in which the court of criminal appeals raised and decided an ineffective assistance claim that the petitioner never presented. Since it is extremely rare for a court to do so, however, his failure here is not surprising.

claim in his Rule 20 petition. Because the district court determined that the procedural default rule applied to this claim, it held that to overcome his default and enable the district court to decide the claim on the merits, Peoples had to show (1) cause for his default and actual prejudice, or (2) that the court's failure to adjudicate the claim on its merits would result in a miscarriage of justice.

For support, the district court cited <u>Coleman v. Thompson,</u> 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed. 2d 640 (1991) in which the Supreme Court stated,

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Implicit in this holding, however, is the proposition that federal habeas review is not barred if the state courts do not honor their procedural default rules. As we stated in <u>Messer v. Florida</u>, 834 F.2d 890, 893 (11th Cir. 1987), "[w]hen the state court has declined to rely upon a procedural default, <u>Campbell v. Wainwright</u>, 738 F.2d 1573 (11th Cir. 1984), <u>cert. denied</u>, 475 U.S. 1126, 106 S. Ct. 1652, 90 L. Ed. 2d 195 (1986), . . . the procedural default no longer bars consideration of the issue in federal court." In the situation at hand, the court of criminal appeals declined to

rely upon the procedural default rule that barred the court from considering, in its review of a Rule 20 disposition, a claim the petitioner failed to assert in his petition. The district court, in denying review of the ineffective assistance claim at issue, invoked this procedural default rule—the very rule the court of criminal appeals had declined to follow. The district court erred in doing so.[54] Instead, it should have addressed Peoples's claim.[55]

---

[54] The district court apparently overlooked our decisions in Messer v. Florida and Campbell v. Wainright, which are cited in the immediately preceding portion of the text, as well as Davis v. Singletary, 119 F.3d 1471 (11th Cir. 1997). In Davis, we confronted the same issue the district court faced here: whether a state appellate court's sua sponte merits consideration of an constitutional issue the petitioner "did not raise . . . at trial or on appeal," and therefore defaulted, precluded the district court from honoring the procedural default and considering the issue/claim on the merits. Id. at 1479. The issue the Florida Supreme Court raised sua sponte in Davis was whether "there was sufficient evidence in the record to support the five aggravating circumstances the trial court had found" in sentencing Davis to death. Id. As the court of criminal appeals did in deciding whether Short had denied Peoples his right to the effective assistance of counsel, the Florida Supreme Court ignored Davis's procedural default and decided the sufficiency-of-the-evidence issue on the merits. Id. The district court, however, in addressing that issue (then presented as a constitutional claim), agreed with the State that Davis had procedurally defaulted the claim notwithstanding that the Florida Supreme Court had passed on the claim's merits. On appeal, we held that the district court erred in treating the claim as defaulted with this statement: "It is settled that once the state courts have ignored any procedural bar and rejected a claim on the merits—not in the alternative but as the only basis of decision—that claim is not barred from federal habeas review." Id. In the situation here, the court of criminal appeals ignored Alabama's procedural bar and decided on the merits whether Short's performance fell short of that required by Strickland.

[55] We think it important at this juncture to reiterate a well-established principle that a state appellate court's routine plain error review of a conviction or sentence does not, standing alone, excuse a procedural default. See Julius v. Johnson, 840 F. 2d 1533, 1546 (11th Cir. 1988); cf. Paprocki v. Foltz, 869 F. 2d 281, 284 (6th Cir. 1989). When, however, as is the situation here, the appellate court, in conducting plain error review, identifies a specific constitutional claim, ignores the fact that the claim has been defaulted, and decides the claim on the merits, we treat the claim on habeas review as if the petitioner had not defaulted the claim and pass on its merits.

58

Having reached this holding, do we remand the claim to the district court for an evidentiary hearing or do we decide it ourselves? We opt for the latter approach. In assessing Peoples's allegations, we bear in mind what the Sixth Amendment requires of defense counsel in a criminal case. The governing standard is set out in Strickland, 466 U.S. at 687, 104 S. Ct. at 2064:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Counsel's performance is constitutionally deficient when it "[falls] below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. In assessing counsel's handling of the case, though, we must be careful to avoid all temptation to "second-guess" his decisions as to trial strategy. Id. at 689, 104 S. Ct. at 2065. Instead, we are to examine "the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690, 104 S. Ct. at 2066.

To establish prejudice, Peoples "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. Put another

59

way, Peoples must establish that Short's errors "undermine confidence in the outcome" of the case.[56]  Id.

Paragraphs 95 through 113 of Peoples's petition describe the ways in which Short's performance failed to satisfy the Sixth Amendment.  We quote these in the margin.[57]  Since in the main they present nothing more than conclusory

---

[56]  The Strickland Court articulated different standards for challenges to convictions and sentences:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

466 U.S. at 695, 104 S. Ct. at 2068-69.

[57]  95. [Short] did not adequately investigate or prepare for [Peoples's] capital trial.
    96. [Short] failed to provide effective assistance on appeal, and during post-trial motion and post-conviction proceedings, by failing adequately to challenge constitutional violations practiced upon his client during the trial and by failing to raise such issues on appeal.
    97. [Short] failed to obtain discoverable material, including all forensic reports, and failed to retain and utilize the services of forensic experts.
    98. [Short] failed to raise the fact that his client was consuming medications throughout the course of the trial proceedings.
    99. [Short] ineffectively argued suppression motions relating to issues of voluntariness, Miranda warnings, attorney-client privilege, and the ineffective assistance of prior counsel.
    100. [Short] failed to make timely objections on evidentiary grounds, upon the trial court's denial of his suppression and dismissal motions, for the duration of the trial [his] objections were framed simply in an effort to preserve the record of his suppression and dismissal motions.
    101. [Short] was inattentive in forgetting about his prior receipt of discovery, failing to obtain certain discovery, abruptly ending certain cross-examinations, and forgetting prior rulings of the trial court.
    102. [Short] failed to object to the overwhelmingly excessive and inflammatory demonstrative exhibits on the obvious grounds that the evidence was designed to excite and impassion the jury.
    103. [Short] failed to object to the production before the jury of the cut skull of one victim and

60

allegations, an evidentiary hearing is unnecessary.  <u>Tejada v. Dugger</u>, 941 F.2d

1551, 1559 (11th Cir. 1991) ("A petitioner is <u>not</u> entitled to an evidentiary hearing

. . . when his claims are merely conclusory allegations unsupported by specifics or

contentions that in the face of the record are wholly incredible." (quotation marks

omitted)).  Aside from this pleading deficiency, Peoples's allegations merely

invite us to second-guess Short's trial strategy.  Whatever that strategy may have

been, however, it did not prejudice Peoples's defense.  In other words, we are

the prosecutor's argument that the skull piece demonstrated a "patterned injury."

104.  [Short] anticipated the trial court's repeated rulings denying his objections by stating before the jury 'that's I assume denied."

105.  [Short] never argued that the probative value of any piece of evidence was outweighed by its unfair prejudice.

106.  [Short's] summation expressly acknowledged that his own client was guilty, by arguing that he was an accomplice to the co-defendant which in combination with the trial court's forthcoming accomplice charge amounted to his confession of guilt.

107.  [Short's] summation expressly conceded that his own client was deserving of capital punishment, by commenting that upon the jury's determination of guilt there would be no reasonable "options" in the next phase of trial except the death penalty itself.

108.  [Short] inexplicably failed to argue in summation that absolutely no evidence of Paul Franklin's cause of death had been introduced.

109.  [Short] in summation complimented the state's witnesses.

110.  [Short] introduced the testimony of a defense witness at the penalty phase who stated that John Peoples should be given the death penalty.

111.  [Short] failed to introduce any evidence at the penalty phase of . . .  Peoples's good and decent family life, his children, and his wife, nor did [he] offer evidence of substantial available mitigation circumstances concerning Peoples's life, character, and significant and numerous lifetime travails which he had always successfully overcome.

112.  [Short] did not render reasonably effective assistance of counsel, in violation of [Peoples's] rights under the . . . Constitution.

113.  [Peoples] was represented at trial, during post-trial motion proceedings, on appeal, and during State post-conviction proceedings and appeals by [Short], a private practitioner from Bessemer, Alabama.  [Short], formerly a district attorney in Alabama, was retained by [Peoples's] parents throughout the course of his representation.

61

convinced that there is no "reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The district court, therefore, correctly denied relief on this claim.

E.

Peoples's petition for habeas relief contained a claim that Ray Robbins—who represented Peoples between his incarceration in the St. Clair County jail for car theft on July 11 and sometime during the week of July 18—deprived him of the effective assistance of counsel. The claim alleged four instances in which Robbins performance was defective. The issue we address in this subpart is whether the district court correctly held that Peoples defaulted two of these instances by not presenting them to the state courts[58] and that, as of the time he filed the instant petition, the state courts would not entertain them on the merits because of the bar against successive petitions.[59] See Picard v. Connor, 404

---

[58] The two instances that the district court held were eligible for federal habeas review are discussed in Part IV.F, infra.

[59] The district court noted that the Alabama courts would not hear the new claims because of both the limitations period and the bar against successive petitions. See Ala. R. Crim. P. 32.2 (the successor of Temporary Rule 20.2). In Siebert v. Campbell, 334 F.3d 1018, 1027 (11th Cir. 2003), however, this court observed that "[prior to 2000] Alabama law made clear . . . that noncompliance with the Rule 32 time bar did not divest courts of discretion to entertain late petitions should they do so." As a result, we held that Rule 32's limitation period time did not qualify as a "firmly established and regularly followed" procedural default rule that precluded substantive relief of federal claims under AEDPA's tolling provision. Id. at 1025. Because

U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971) ("It has been settled . . .

that a state prisoner must normally exhaust available state judicial remedies before

a federal court will entertain his petition for habeas corpus." (citation omitted)).

The claims of ineffective assistance at issue are that (1) "Robbins permitted

[Peoples] to discuss the red Corvette with law enforcement authorities" which led

the authorities to "key evidence" that convicted him; and (2) Robbins lied to the

authorities when, on July 12, he told them that Peoples "didn't have anything that

would help them." Peoples disputes the district court's conclusion that he had

defaulted these claims by contending the claim he brought in his Rule 20 petition

was "far broader" than the district court recognized. We disagree. In its

_____

Peoples petitioned the district court before 2000, <u>Siebert</u> applies, and the district accordingly erred in concluding that Rule 32.2's limitation period foreclosed federal review of Peoples's claim. However, Peoples was not prejudiced by this error because Rule 32.2(b)'s bar against successive petitions does preclude federal review. <u>See</u> <u>Ex parte Singleton</u>, 548 So. 2d 167, 170 (Ala. 1989) ("Temporary Rule of Criminal Procedure 20.2(b) . . . provides that '[a] second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."). Because the bar against successive petitions was "firmly established and regularly followed" by Alabama courts, the district court correctly observed that Peoples would not be permitted to raise his new claim in a successive Rule 20 petition since the facts underlying his claim were ascertainable at the time his first petition was heard. <u>See</u> Ala. R. Crim. P. 32.2(b); <u>Ex parte Singleton</u>, 548 So. 2d at 170 ("While [Rule 32.2(b)'s precursor] Rule 20.2(b) did not go into effect until April 1, 1987, that rule is based upon case law which was in existence at the time of [petitioner's] 1986 coram nobis petition." (citing <u>McLeod v. State</u>, 415 So. 2d 1232, 1233 (Ala. Crim. App. 1982)).

Memorandum Opinion accompanying its order denying the petition, the circuit court articulated Peoples's challenge to Robbins's performance.

> Peoples alleged that the lawyer who represented him before his trial, Ray Robbins, rendered ineffective assistance. First, Peoples alleged that Robbins was ineffective for failing to obtain a written agreement concerning a polygraph examination for Peoples. Second, he alleged that his July 19, 1983 confession was taken in violation of Robbins's instruction to the police and that he was thus denied effective assistance of counsel as to that confession.

As one can readily see, Peoples's Rule 20 petition said nothing about Robbins's having "permitted [Peoples] to discuss the red Corvette with law enforcement authorities" or lying to the authorities as to when he said that Peoples "didn't have anything that would help them."

Citing language from a footnote in Footman v. Singletary, 978 F.2d 1207, 1211 n.4 (11th Cir. 1992) that reads, "a petitioner need not present all instances of ineffective assistance of counsel to the state court before proceeding to federal court when the state court has reviewed the entire record to evaluate the ineffective assistance claim[,]" Peoples argues that the state circuit and appellate courts, in assessing his claim that Robbins was constitutionally ineffective, examined everything Robbins did—including things not mentioned in the Rule 20 petition. In other words, no matter how narrowly Peoples pled his claim, the mere fact that he made the claim, standing alone, constructively invited the state courts

to scour the entire record for any evidence that Robbins's deprived him of a Sixth Amendment right. If <u>Footman</u> endorsed the proposition Peoples attributes to it, this argument might have some merit; however, the case actually stands for the converse. Although Peoples's brief selectively quotes from <u>Footman</u>, the panel in that case ultimately ruled, "we agree with the district court's statement of law that a habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously." <u>Id.</u> at 1211. The panel explained its reasoning by noting that "allowing a habeas petitioner to allege a single instance of ineffective assistance in his state post-conviction proceedings and then proceed to federal court to allege additional instances would be contrary to the state's 'full and fair opportunity to address the claim on the merits.'" <u>Id.</u>

Peoples does not present us with an argument as to why the logic that guided this court in <u>Footman</u> does not apply here, and we see none. <u>Cf. Hill v. Jones</u>, 81 F.3d 1015, 1021 (11th Cir. 1996) ("A court is not obliged to stand by as successive teams of attorneys cull the record and conjure up new arguments for the court to consider. At some point, the court has to assume the parties have made their arguments, and it can begin resolving the disputed issues." (footnote omitted)). Because Peoples failed to raise these two instances of ineffective

65

assistance of counsel in the state courts, he had to demonstrate both cause and prejudice to excuse his procedural default. Id. at 1022. As he failed to do so, the district court correctly ruled that these two instances of ineffective assistance were barred from federal review.[60]

## F.

In this subpart we consider the two challenges to Ray Robbins's performance that the district court decided on the merits.

## 1.

The first relates to a verbal agreement Robbins purportedly made with Dennis Abbott, an Assistant District Attorney for St. Clair County, on July 13, 1983. As we relate in Part II.A, supra, and as the circuit court found in its Memorandum Opinion disposing of Peoples's Rule 20 petition, Peoples, 565 So. 2d at 1181-83, on July 13, Peoples told an officer at the St. Clair County jail that he wanted to take a polygraph examination. He was still insisting that he had not stolen Paul Franklin's Corvette and claimed that a polygraph examination would

---

[60] Peoples initially contended that Short afforded him ineffective assistance by failing to bring these instances of Robbins's ineffectiveness to the attention of the Rule 20 court, and that Short's ineffectiveness established "cause" for his failure to present them. However, as his attorney conceded during oral argument, the contention is without merit; the Sixth Amendment does not apply in post-conviction collateral proceedings. Ross v. Moffitt, 417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974); Pennsylvania v. Finley, 481 U.S. 551, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987); Murray v. Giarratano, 492 U.S. 1, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989).

bear him out.  Later in the day, Peoples told Robbins that he knew that the Franklins were dead.  In the same breath, he assured Robbins that he had nothing to do with their deaths and that a polygraph examination—which he had told one of the jailers he was willing to take—would establish his innocence.  He told Robbins that he would take the authorities to the Franklins's bodies if they would agree to release him from custody (on the car theft charge) once he passed a polygraph examination.  Robbins, in turn, conveyed Peoples's offer to Abbott, and Abbott accepted it.

The court of criminal appeals, in affirming Peoples's convictions and sentences, described what transpired next.

> At about 5:00 p.m. on July 13, about 30 minutes to an hour after leaving Abbott, [Peoples] and [Robbins] were brought from the county jail to the sheriff's office. [Robbins] told Officer Marvin Roy that [Peoples] had some information to add to his prior statement. Then, in the presence of [Robbins] and Officers Harmon and Traylor, [Peoples] stated that the Franklin family was dead.  Officer Traylor then asked [Peoples] if he would take them to the bodies. [] Abbott was called to come to the sheriff's office, and when he arrived, [Robbins] said 'John Peoples is going to tell ya'll some more.  All of them are dead.' [Peoples] then took the police to the bodies of the Franklin family in Talladega County, in a wooded area just off County Road 377.

Peoples, 510 So. 2d at 559.

Because the bodies were found in Talladega County, that county's District Attorney, Robert Rumsey, entered the picture.  On the night of July 14, he spoke

67

to Abbott and learned that a polygraph examination had been tentatively scheduled for July 15 in Gadsden.  Id. at 560.  On the morning of the 15th, Robbins brought a document to Abbott's office and asked Abbott to sign it.  The document purported to memorialize the verbal agreement he and Abbott had reached on July 13.  Abbott would not sign the document.  He "refused to sign the document because it did not accurately reflect their July 13th discussion regarding the polygraph test."  Id.  Rumsey also had problems with the document when Robbins presented it to him.  Robbins, however, still believing Peoples's protestations of innocence, pressed Rumsey to go forward with the polygraph examination.  Rumsey relented, and the examination was set to take place later in the day.  Id.

Peoples refused to take the test, though, after the polygraph examiner informed Peoples of the questions he would ask him and refused to limit his inquiry to the precise questions Peoples requested.  See supra note 13.  As the circuit court found in its October 14 order denying Peoples's motion to dismiss the indictment, in its December 2 mid-trial order denying Peoples's motion to suppress, and in its Memorandum Opinion denying Peoples's Rule 20 petition, Peoples, 565 So. 2d at 1181-83, assuming that Robbins and Abbott had reached the agreement Robbins had described—the agreement Peoples said they had made

but had not been reduced to writing—Peoples breached it by not submitting to the polygraph.[61]

Nevertheless, Peoples claims that Robbins deprived him of his right to the effective assistance of counsel because Robbins failed to get his agreement reduced to writing and signed by the parties before Peoples led the police to the Franklins's bodies in the evening of July 13. Peoples implies that Robbins's failure to obtain a binding agreement was the reason why he refused to go forward with the polygraph examination. He goes one step further and implies that the examination would have shown that he had not participated in the Franklin murders. We reject Peoples's argument on the grounds that follow below.

The second prong of <u>Strickland</u>'s ineffective assistance of counsel standard requires that the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S. Ct. at 2068. Even if we assume that Robbins's was constitutionally deficient—and, also, that the state courts's determinations to the contrary were "unreasonable"—we are left with the firm

---

[61] The circuit court's decision denying Peoples's Rule 20 claim that Robbins provided ineffective assistance of counsel was based on evidence adduced at three hearings: the October 4 hearing on Peoples's motion to dismiss the indictment, the December 1-2 mid-trial hearing on Peoples's motion to suppress evidence (and his renewed motion to dismiss the indictment), and the December 13, 1988 hearing held on Peoples's Rule 20 petition.

conviction that the Rule 20 court's conclusion that Peoples's claim fails for lack of prejudice did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . or . . . result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).[62]

First, Peoples's statements to Officers Harmon and Traylor that the Franklins were dead were not presented to the jury at trial. Neither was the fact that it was Peoples who led the police to where the bodies laid. Second, as the court of criminal appeals found in affirming Peoples's convictions and sentences, "the bodies would have been discovered by the police through an independent source." Peoples, 510 So. 2d at 569.

> On the day of [Peoples's] arrest, he told the police that his cousin, Timothy Gooden, had been with him at the Franklin residence when he bought the Corvette. [ ] Gooden was, therefore, questioned by the prosecutor that night. On July 15, two days after [Peoples] had led the police to the bodies . . . Gooden, based on his own knowledge of the location, led the police to the same location. We find that . . . Gooden's assistance was an independent source as contemplated by that doctrine.

---

[62] Moreover, we presume that the Alabama courts' "determination of a factual issue . . . is correct." 28 U.S.C. § 2254(e)(1).

Id. Third, Peoples actually obtained the consideration—a polygraph examination—he sought in exchange for taking the police to the bodies; hence, Robbins's failure to obtain a signed agreement, as the Rule 20 court found, was of no moment. Peoples, 565 So. 2d at 1181-83. Fourth, Peoples did not refuse to submit to a polygraph examination because Robbins had not obtained a signed agreement, "Peoples refused to take the polygraph test because he was guilty of the murder of the Franklins and knew the test would prove it." Id. at 1182. And finally, the evidence that Peoples committed the murders was overwhelming. In the absence of prejudice, even assuming Robbins's performance was constitutionally deficient, Peoples is not entitled to relief.

2.

Peoples's second challenge to Robbins's performance relates to the statements Peoples gave the sheriffs of St. Clair County and Talladega County, Lewis Brown and Jerry Studdard, on July 19, 1983. As related in Part I, supra, after waiving his Miranda rights, Peoples confessed to the murders, told the sheriffs where they could find the blanket he used to cover Paul Franklin, gave them the approximate location of the rifle he used to murder Judy Franklin and Paul, Jr, and composed and signed a statement: "The Case I am in I did DO IT Concerning the Franklin Family I did DO IT." In his pre-trial motion to suppress

71

evidence and at the mid-trial hearing on the motion, Peoples argued that he had

not waived his Miranda rights when he confessed to the sheriffs and gave them the

signed statement.  The trial court disagreed and thus rejected the argument.  On

appeal, the court of criminal appeals affirmed.

> It is clear that [Peoples], not the police, was the one who initiated the
> conversation on July 19.  It is also clear that the police knew
> [Peoples] had counsel and attempted to respect that relationship by
> trying to call that attorney before agreeing to talk to [Peoples].
> [Peoples] voluntarily, knowingly, and intelligently waived his right to
> counsel.  Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.
> 2d 694 (1966).

Peoples, 510 So. 2d at 570.

In his Rule 20 petition, Peoples reiterated his Miranda claim, and the circuit

court rejected it as not cognizable in a Rule 20 proceeding.  He also claimed that

his confession to the sheriffs was the product of ineffective assistance of counsel

on Robbins's part.  In the words of the circuit court, Peoples alleged "that his July

19, 1983 confession was taken in violation of Robbins's instruction to the police

and that he was thus denied effective assistance of counsel as to that confession."

Peoples, 565 So. 2d at 1181.[63]  The circuit court disposed of this claim thusly:

---

[63] Peoples's brief to the Rule 20 circuit court does not expressly link his Miranda challenge to
the admissibility of the July 19 confession with Robbins's allegedly deficient performance, but it
is possible the connection was made explicit at oral argument.  Although the record is unclear on
this point, it is evident from the circuit court's Memorandum Opinion denying Peoples's Rule 20
petition that the court treated the challenge as an ineffective assistance of counsel claim.  See
Peoples, 565 So. 2d at 1181-83.

[T]his Court addressed the circumstances surrounding Peoples's July 19, 1983 confession in its order denying Peoples's motion to suppress. In its order, the Court found that Peoples initiated the contact with Sheriff Brown which led to his July 19, 1983 confession. The Court found that Sheriff Brown offered to contact Peoples's lawyer but that Peoples refused. The Court found that Peoples voluntarily confessed after waiving the presence of an attorney.

The Court of Criminal Appeals affirmed this Court's finding that Peoples waived his right to counsel before confessing. Because Peoples initiated the contact with Sheriff Brown which led to his confession and waived the presence of Robbins when he confessed on July 19, 1983, there is no basis for his contention that Robbins rendered ineffective assistance.

Id. at 1183 (citations omitted).

In his petition to the district court Peoples took a different and contradictory position regarding Robbins's instructions to the police. Instead of alleging that the police had obtained Peoples's confession "in violation of Robbins's instruction to the police," as alleged in his Rule 20 petition, Peoples alleged that Robbins was derelict because "[he] neglected to direct law enforcement authorities not to speak further with his client and merely suggested that they not do so."[64] Peoples thus

---

[64] In support of his Rule 20 claim challenging the admissibility of his confession on July 19, Peoples cited Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) along with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In our view, Brewer v. Williams, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), is the closest case in point. There, the police interrogated the defendant after his attorney instructed the police not to do so in his absence. The Court held that the defendant was entitled to a new trial because the police had deprived him of his Sixth Amendment right to assistance of counsel. Id. at 406, 97 S. Ct. at 1243. In reaching that holding, the Court considered and rejected the State's argument that the defendant waived that constitutional right before the police began to question him. Id. at 404-06, 97 S. Ct. at 1242-43.

By contrast, in support of his ineffective assistance claim challenging the July 19 confession

73

implied that had Robbins firmly instructed law enforcement not to question

Peoples, he would not have spoken to the sheriffs on July 19 and confessed to the

murders.

It is apparent to us that Peoples never presented this instance of ineffective

assistance to the Alabama courts, and that, as of the time he filed the instant

petition, Rule 20's bar against successive petitions precluded those courts from

considering the new instance of ineffective assistance on the merits.  See supra

note 59.  Federal review is therefore, precluded.  See Footman, 978 F.2d at 1211.

Consequently, as for this alleged instance of ineffective assistance of counsel,

Peoples failed to exhaust his state remedies.  See 28 U. S. C. § 2254(c).

Nonetheless, "[a]n application for a writ of habeas corpus may be denied on the

merits, notwithstanding the failure of the applicant to exhaust the remedies

available in the courts of the State."  Id. § 2254 (b)(2).

The district court denied this particular allegation of ineffective assistance

because Peoples had not been formally charged with the Franklin murders at the

---

in the district court, Peoples cited no cases beyond Strickland.  Nevertheless, it is evident that this claim, as presented to the district court and in his brief to this court, constituted a direct attack on Robbins's performance, whereas the claim presented before the Rule 20 court alleged that the police had violated Peoples's rights under the Sixth Amendment by interrogating him outside the presence of counsel in derogation of Robbins's instructions.  In sum, one claim specifically challenges the conduct of the police officers, while the more recent claim challenges the adequacy of Robbins's performance.

time he confessed to the sheriffs.  Quoting from <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158 (1991), the court began its analysis by noting that the Sixth Amendment right to counsel is offense specific and does not generally attach until prosecution for a specific offense is commenced "by way of formal charge, preliminary hearing, indictment, information or arraignment."  Based on this reasoning, the court determined that Peoples's right to counsel with respect to the murder charges did not attach until Peoples had been indicted for capital murder on August 3, fifteen days after he met with Sheriffs Brown and Studdard.

Peoples, however, has identified a narrow exception to the "offense specific" rule which some circuits have applied in cases where police questioning on "the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." <u>United States v. Hines</u>, 963 F.2d 255, 257 (9th Cir. 1992).[65]  Relying on this

---

[65]  Many circuit courts have discussed the "closely related" or "inextricably intertwined" exception with approval.  <u>See, e.g.,</u> <u>United States v. Melgar</u>, 139 F.3d 1005, 1013 (4th Cir. 1998); <u>United States v. Arnold</u>, 106 F.3d 37, 40-41 (3d Cir. 1997); <u>United States v. Doherty</u>, 126 F.3d 769, 776 (6th Cir. 1997); <u>United States v. Carpenter</u>, 963 F.2d 736, 740 (5th Cir. 1992). These cases, however, have been overruled by <u>Texas v. Cobb</u>, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d. 321 (2001), a case we discuss in the subsequent text.

exception, Peoples contends that because the facts and circumstances underlying the theft-of-the-Corvette charge were so closely related to the facts and circumstances surrounding the murder charge, his Sixth Amendment right to the effective assistance of counsel in the murder case attached no later than July 12, the day immediately following his incarceration in the St. Clair County jail for vehicular theft.

The district court concluded that our holding in Waldrop v. Jones, 77 F.3d 1308 (11th Cir. 1996), foreclosed Peoples's argument. The court reached this conclusion without the benefit of the Supreme Court's recent opinion in Texas v. Cobb, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001). In Cobb, the Court re-affirmed that

> The Sixth Amendment right [to counsel] . . . is offense specific." Id. at 167, 121 S. Ct. at 1340. The Court framed the issue by observing that, "The State sought review in this Court, and we granted certiorari to consider first whether the Sixth Amendment right to counsel extends to crimes that are 'factually related' to those that have actually been charged, and second whether respondent made a valid unilateral waiver of that right in this case. Because we answer the first question in the negative, we do not reach the second."

532 U.S. at 167, 121 S. Ct. at 1340. If Cobb does not wholly eviscerate the "closely related" exception Peoples relies on, it comes close.

Rather than holding that Cobb disposes of the ineffective assistance claim at issue, we will assume, for sake of argument, that Cobb does not apply and, further,

76

that Robbins's instructions to law enforcement were inadequate to protect Peoples's rights. Given these assumptions, we turn to the question of whether Peoples's has demonstrated the prejudice Strickland requires. The answer to the question is provided by the evidence before the jury in addition to the confession Peoples gave the two sheriffs. Without recounting the facts we have extensively recited in Part I, supra (and that recitation does not exhaust all of the facts established by the physical, testimonial, and circumstantial evidence the prosecution introduced), we do not hesitate to conclude that there is no "reasonable probability" that the outcome of Peoples's trial, or the sentences he received, would have been different had it not been for Robbins's alleged failure to make it clear to law enforcement that under no circumstances were they to speak to Peoples in the absence of counsel. In short, Peoples's statements to officers on July 19 and July 22 did not prejudice the outcome of this case.

## V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.